By the Court.—Sedgwick, Ch. J.
The defendant made a motion for a new trial upon the minutes. The motion was denied, but as no order was entered upon this denial, no appeal from it can be taken and the questions appropriate to a review ef such an order, cannot be examined here.
The merits of the case involve a construction of the phrase in the policy “directly by a sea.”
The policy had in its printed part the usual clause, as to the perils of the seas, that is “ touching the adventures and perils, which the said assurers are contented to bear and take upon themselves, they are of the seas, &c.”
The phrase in view, “directly by a sea,” was in the following written provision, “liable only for loss of animal or animals, caused directly by a sea, stranding, sinking, burning or collision, &c.”
The appellant argues that the phrase was inserted in the general policy, after this particular indorsement was made, and was intended to be applied to future shipments only. The position cannot be maintained. The circumstantial evidence, considered with the conflict of direct evidence, supports the verdict of the jury, on this issue.
As to the construction of the phrase it is first observed that while a peril of loss caused directly by a sea is a particular risk that would have been embraced in the general provision as to perils of the sea, if that had remained effective in the policy, it is not because the word “seas” is the plural of the word sea. ■ Policies generally have “ peril of the seas,” but writers upon insurance and judges, often use as an equivalent “ peril of the sea.” The word “ seas ” *142 in the general provision has no specific or limited reference to the ocean as a body of water. It is contrasted to land. It refers to the peculiarities of the contingencies of living and trading upon water, as distinguished from living and trading upon land. It is certainly true, that the particularizing of one of the perils of the sea, in a written clause, to which the general clause, being printed, becomes subordinate or inoperative, will not, for that reason, affect the application of the maxim, causa próxima non remota spectatur. The full force of this consideration is not inconsistent with ascertaining what particular peril was described, whether it arose in fact, and whether the loss was caused by it.
The definitions of dictionaries seem to give wha.t is the use of the word “sea” among seafarers as well as among people generally. Webster makes sea to mean a wave, a billow, as to ship a sea ; the swell of the ocean in a tempest; motion or agitation of the water’s surface. Falconer’s Marine Dictionary by Burney says: ‘‘ Sea is variously applied by sailors, to a single wave, to the agitation produced by a multitude of waves in a tempest, or to their particular progress or direction. Thus they say, ‘we shippéd a heavy sea, there is a quiet sea in the offing, the sea sets to the southward.’ Hence a ship is said to head the sea, when her course is opposed to the direction or setting of the surges.” This is given after sea is defined as a separate word to mean “ that vast tract of water encompassing the whole earth, more properly called ocean,” and also as another word, “ more properly used, for a particular part of the ocean,” as “The Irish Sea, The Mediterranean Sea, The Baltic Sea, The Bed Sea.”
There may be doubt, that parties to such contract could accurately state the difference between the articles “a” and “ the,” yet if they use one or the other in a way that exhibits a discrimination in fact, that discrimination must have its proper weight.
Writers on language say that the definite article always grows out of a demonstrative pronoun, the indefinite out of *143 the numeral one ; that an or a is the numeral one ; the is the demonstrative that.
The parties meant by a peril of “a sea” not a peril of the sea that might be in the winds as well as in the water, but a risk connected with a movement of the water of the sea. As it was described as a or one sea, the intention was to designate some part of the water, for example a wave, of which there might be several, each of which would be a different object from the general body of water and would involve its peculiar or characteristic risk.
A sea, in the sense of a general agitation of the water or waves, was not meant, because that is a collective term, embracing many waves,, and it ceases to be applicable when the individual waves which compose it are intended to be designated. A loss could not occur from the particulars, considered collectively, but only from their proper individual effects.
I do not mean that the parties confine themselves to a wave specifically, but they intended a definite and separated part of the general body of water, and a risk that would be peculiar to that, and a loss that might be definitely traced from that.
The general rule, that the peril insured against must be the causa próxima of the loss, to justify a recovery, is now to be taken into consideration. In reality this rule gives only a general principle, and furnishes no information as to what is meant by a proximate cause. In this case, it may at this'point be sufficient to say that the particular peril described must be the immediate cause of the loss.
But the use of the word “ directly ” has a relevancy to the special application of the maxim. It is not to be taken as if the parties were giving a definition of the maxim as embodying a general principle. Its connections show that it was not used as a term of art, but as a word descriptive of a possible fact, of a sea not indirectly but directly, in a point-blank manner, as it were, causing the loss. In another aspect it exhibits the intention of the parties in such a light that the maxim must have a strict *144 construction, instead of the liberal construction usual in the eases of insurance. In Tilton v. The Hamiton Fire Ins. Co. (1 Bosw. 378), Judge Dues, said : “Strictly speaking, the proximate cause is that which immediately precedes and directly occasions a loss.”
The meaning of the parties may appear more definitely by a reference to the subject matter of the loss to be insured against. Before making the policy, doubtless the parties had in mind what risks the insurers would take, and what, the insured, under ordinary circumstances. The insurer would not take risks of loss that would arise in the nature of the thing insured in the ordinary situations of a sea voyage (1 Parsons’ Mar. Ins. 541). The memorandum articles are selected on the ground of the likelihood of their being in a different state at the end of the voyage, from that, at the beginning when no extraordinary peril has caused the difference. In this particular case, the ordinary motion of a vessel would be likely to throw animals down and lessen their value or endanger their lives.
In the note (2 Parsons’ Mar. Ins. 94), it is said that the difference of risk pertaining to different kind of goods has been recognized in. insurance business, for, at least, three or four centuries. “ The ordinance published in Florence in 1526, says : 1 That under the name, of merchandise shall not be understood slaves, fruits, horses, corn, wine, salted fish, &c.’ ”
It would be evident, too, that, in extraordinary circumstances, animals would be from the pitching and tossing of a vessel more exposed, than merchandise, to great damage. They would be unable to control their motions when once off their feet and to regain a safe position. This would be due to their conformation. These considerations would prompt a selection of a cause of loss to be insured against, which excludes the contingency of a loss, due, for the most part, to the helplessness of animals that has been referred to, and yet would give indemnity, when loss was suffered directly from it, although then their helplessness, might to a certain, but not great extent, contribute to the *145 final loss. A loss that follows the direct action, upon animals, of a sea, shipped, would as practically as possible distribute between the parties the risks each would be likely and willing to take. This has a further force, when the fact is, that before the words “by a sea’’were inserted, the clause stood “loss caused directly by stranding, sinking, burning or collision and amounting to 5 per cent.”
In the present case, the loss happened from the following circumstances. The cattle were stowed below the upper deck in the forward steerage and on the forward part of the main deck. On February 18 the wind increased to a gale, with a high sea running. The vessel labored and rolled heavily and shipped such quantities of water over all, that the decks were flooded and all the hatches had to be battened down. This state of things continued for ten days, about. The voyage was from February 14 to March 2. The effect upon the cattle was that they were thrown down violently, and in some cases thrown completely out of their stalls. One hundred and fifty-six died from being bruised and from exhaustion. Some of the cattle were tossed out of their stalls and thrown into other stalls on top of other cattle. The master of the vessel testified : “ Q. Was the cattle being tumbled about in the way you have described, the cause of their death ? A. Yes, I consider that it was. Q. What was the cause of the death of the cattle, the whole cause of it % A. The cause of the death of the cattle was the severity of the sea at the time. Q. What was the effect on the cattle that were not killed? A. They were very much bruised and unable to stand on their legs, and some of them had to be hoisted ashore.” There was some evidence tending to show that some of the cattle died from want of air, the hatches having been battened down. None of the cattle suffered injury from any direct action of the water upon them. There was no evidence that any water reached them. I am of opinion that the general tossing and laboring of the steamer, which caused the injury to the animals was not the result of a sea, in the sense of the policy but of the general commotion of the sea *146 and of the winds, and that for these reasons the defendants were not liable for the loss, on the evidence as given.
The learned court was led to the’ opinion that the policy did not value the interest insured because the indorsement did not value but only named an amount insured. It, however, seems to me that the general policy made special provisions that it should be a valued insurance by or through the means of indorsements that should simply contain amounts of insurance. This provision was “ endorsements valued at the same, provided they do not vary from the-more than-per cent., and the sound value at the place- of destination is not to be deemed to exceed-per cent, on purchasing price at the shipping port.” As ■ the blanks for these percentages were not filled in, it is argued that the whole clause was not agreed to. It seems to me, that as the proviso was separable from the rest; and introduced for the benefit of the insurers, it became ineffective for any purpose as a proviso, without affecting the main clause which it followed. There was moreover an independent subsequent clause, which had an unqualified meaning. “The said goods and merchandise hereby insured are valued at as indorsed.” And again, if there be ambiguity, the application made and signed by the insured and signed by the insurers provided for a valued policy in the words, “enter on open policy, &c., $9,500 on i interest, &c., valued at sum insured.” If there be a valued policy, the value of the cattle saved would properly be deducted from the valuation. Under some circumstances, this might call only for a modification of the verdict, but on the whole case there should be a new trial.
Judgment reversed, with costs of appeal to abide event.
O’Gorman, J., concurred.